UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | CRIMINAL ACTION H-14-43 |
| § | |
| CONRAD ALVIN BARRETT § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court is defendant Conrad Alvin Barrett's ("Barrett") motion to revoke the Magistrate Judge's detention order and set bond. Dkt. 28. After considering the motion, response, evidence of record (including the pretrial services report), and applicable law, Barrett's motion to revoke (Dkt. 28) is **DENIED**.

**I. INTRODUCTION**

On November 24, 2013, Barrett, a 27-year old white male, approached a couple at a restaurant in Fulshear, Texas. Dkt. 1 (affidavit to the criminal complaint) at 1. The couple, a male and a female, had never met Barrett before. *Id.* Barrett asked them if they had heard of the "knockout" game.[1] *Id.* Barrett then informed them that he had played the knockout game earlier that day in Katy, Texas, and he retrieved his cell phone and showed them a video. *Id.* The video did not show the face of the person holding the phone, but it did show the legs and shoes of that person. *Id.* The man that Barrett approached, an off-duty Katy arson investigator, noticed that the video showed a man with brown loafers and shorts and that Barrett was wearing the same. *Id.* The investigator also believed that the voice on the video matched that of Barrett. *Id.* In the video, the investigator saw a man walk up to an

---

[1] The "knockout" game, as it has been reported by the media, is an assault in which the assailant attempts to knock out an unsuspecting victim in a public area, such as a sidewalk, with a single punch to the face. *See, e.g.*, Emma Fitzsimmons & Julie Turkewitz, *Man Faces Charges in Attack in Brooklyn*, N.Y. TIMES, Nov. 24, 2013, at A30.

1

elderly African- American gentleman and ask him, "How's it going, man?" *Id.* The person on the video, whom the investigator believed was Barrett, came closer to and punched the elderly man, laughed and yelled "knockout," and then fled in his vehicle. *Id.*

After seeing this video, the couple left the restaurant and flagged down a uniformed police officer across the street. *Id.* This officer, Michael McCoy of the Fulshear Police Department, listened as the couple discussed what they saw. *Id.* As Barrett exited the restaurant, the couple pointed Barrett out to Officer McCoy. *Id.* The officer then approached Barrett and asked him if he had shown a video to the couple. *Id.* at 2. Barrett responded affirmatively, and Officer McCoy asked to see the video. *Id.* Barrett, however, showed McCoy a different video than what he had shown the couple. *Id.*

Officer McCoy confiscated the phone and informed Barrett that the phone contained evidence of a crime. *Id.* Barrett left the scene. *Id.* On December 2, 2013, Officer McCoy obtained a search warrant for Barrett's cell phone in Fort Bend County. *Id.* Four days later, on December 6, a Drug Enforcement Administration ("DEA") agent retrieved the video shown to the couple on November 24, plus ten other videos recorded that day. *Id.* On the original video, Barrett allegedly states: "The plan is to see if I were to hit a black person, would this be nationally televised?" *Id.* In other videos, Barrett purportedly claims that "This is Conrad," uses the word "nigger," and states that African-Americans "haven't fully experienced the blessing of evolution." *Id.* Barrett also allegedly says that he has been trying to work up the courage for a week to play the knockout game and that he may have "found the perfect African-American suspect." *Id.*

On December 6, 2013, the Fulshear Chief of Police, Kenny Seymour, identified the victim as R.C., a 79-year old African-American man. *Id.* R.C. claimed that he was assaulted on November 24, 2013 as he was walking down the street. *Id.* He told police that he sought treatment at Memorial Hermann Katy Hospital on November 25, where he was diagnosed with two jaw fractures and

underwent surgery to insert two metal plates in his jaw and have three teeth removed. *Id.* R.C. was hospitalized for approximately four days. *Id.*

On December 24, 2013, Special Agent Alfred T. Tribble of the Federal Bureau of Investigation ("FBI") filed a criminal complaint against Barrett, alleging that he had willfully assaulted R.C., an African-American, because of his actual or perceived race and color, in violation of 18 U.S.C. § 249(a)(1). *Id.* at 3. Magistrate Judge Frances H. Stacy signed the complaint the same day, finding probable cause that Barrett committed the alleged offense. *Id.* Barrett was arrested and made his initial appearance before Judge Stacy on December 26, 2013. Dkt. 5 at 1. Judge Stacy set a probable cause and detention hearing for the following afternoon. *Id.*

The Pretrial Services Department interviewed Barrett on December 26. Dkt. 12. Based on Barrett's admitted abuse of narcotics and alcohol, his mental status, and the severity of the alleged offense, Pretrial Services found that Barrett posed a risk of danger to the community and a risk of non-appearance for court settings. *Id.* at 3. Despite this assessment, Pretrial Services recommended that Barrett be released on bond subject to multiple conditions, including substance abuse screening and treatment, travel restrictions, and psychiatric evaluation and treatment under the guidance of Pretrial Services. *Id.* at 4.

On December 27, 2013, Judge Stacy held a detention hearing in accordance with 18 U.S.C. § 3142(f). Dkt. 7. The court received testimony from Special Agent Tribble as well as the defendant's father, Patrick Barrett ("Patrick"). Dkt. 22 (Hr'g Tr.). Tribble's testimony recounted his investigation of R.C.'s assault and discovery of Barrett, as he previously explained in the complaint. *Id.* Tribble further testified that R.C. did not initially report the assault to police. *Id.* at 15. Instead, R.C. told his daughter on November 25 that he had fallen and suffered the injuries to his face. *Id.* After law enforcement ultimately identified R.C. and spoke with him, he explained that he did not tell his daughter

3

the truth of the attack because of his fear that he would be causing trouble by reporting an incident involving a white male's assault on an elderly black man. *Id.* at 16. He recalled that when he was growing up, he believed that if a white man did something to a black man, it was better to ignore the incident than to report it. *Id.*

After Agent Tribble testified, Barrett called Patrick to the stand. Patrick testified that he and his wife live in Fort Bend County and have been married for 29 years. *Id.* at 44. Barrett is their only child, and Barrett intended to move back in with his parents if he was granted release pending trial. *Id.* Patrick knew that his son was diagnosed with bipolar disorder in 2005. *Id.* at 45. Barrett is on a number of medications, including lithium to stabilize his mood and prevent future manic and depressive episodes. *Id.* Although Barrett has taken medication for a number of years, Patrick was aware that his son had been off his medication for at least three weeks before the November 24, 2013 incident. *Id.* Patrick further testified that if Barrett moved back into his home, Patrick would enforce Barrett's medication regimen as part of the morning routine. *Id.* at 46. He would also co-sign any bond that the court might impose. *Id.*

On cross-examination, Patrick admitted that for some time he had reminded his son to take his medication every morning. *Id.* at 54. On November 24, Barrett was not living with his parents, but over the previous months Barrett rode to work as a landman each morning with his father. *Id.* at 57. Patrick was also aware on the date of the assault, based on a phone call he received from Barrett, that his son had been drinking scotch despite previous attempts to maintain sobriety. *Id.* at 58–59.

At the end of the hearing, Judge Stacy found that there was probable cause to believe that Barrett committed the offense alleged in the complaint. *Id.* at 77. She further rejected the Pretrial Services recommendation regarding bond and ordered Barrett detained, finding that there was not a condition or combination of conditions that would reasonably assure the safety of the community. *Id.* Judge

Stacy based her "decision not only on the weight of the evidence but also the nature and circumstances of the offense and Mr. Barrett's own personal history and characteristics." *Id.* In her written order, Judge Stacy further found that there was a serious flight risk associated with Barrett, and based on his history and the nature of the offense, "no standard conditions of release will assure the appearance of [Barrett] at all future court proceedings in this matter and assure the safety of the community." Dkt. 8 at 3.

On January 23, 2014, Barrett was indicted by a grand jury that found probable cause that Barrett "willfully caused bodily injury to R.C. because of R.C.'s actual and perceived race and color." Dkt. 14 (indictment) at 1 (citing 18 U.S.C. § 249(a)(1)). Judge Stacy arraigned Barrett on January 30, 2014, at which time he entered a plea of not guilty. Dkt. 18. Barrett is currently set for a jury trial in this court on September 8, 2014. Dkt. 25. On June 13, 2014, Barrett filed a motion to revoke Judge Stacy's order, to which the government responded. Dkts. 28, 31.

## II. Findings of Fact[2]

1. Barrett is a United States citizen and resident of Katy, Texas. Dkt. 12 (pretrial services report) at 1.

2. Before entering custody, Barrett resided with his wife at their Katy residence for 2.5 years. *Id.* His parents live near Barrett, also in Katy, Texas. *Id.*

3. Barrett was diagnosed with bipolar disorder and depression in 2005 and with hyper-insomnia in 2012. *Id.* at 2. He has been prescribed medication for these conditions, which he has been directed to take daily. *Id.* He has been under the care of Dr. John Marcellus since 2005. *Id.*

---

[2] To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and to the extent any Conclusion of Law reflects a factual finding, it shall to that extent be deemed a Finding of Fact.

4. Barrett has had a history of substance and alcohol abuse since 2004. *Id.* He obtained sobriety in December 2005 after undergoing in-patient and out-patient treatment services through private providers. *Id.* He maintained sobriety for over 4 years until relapsing in 2010. *Id.* Since 2010 he has been unsuccessful in long-term abstinence from alcohol and illegal narcotics. *Id.* In the fall of 2013, he consumed alcohol daily, marijuana weekly, and cocaine once. *Id.*

5. On June 20, 2003, Barrett was arrested on DWI charges in Katy, Texas. *Id.* at 3. On July 22, 2003, he was convicted and sentenced to 1-year probation and a $200 fine. *Id.*

6. On August 26, 2004, Barrett was arrested in Conroe, Texas for burglary of a vehicle and possession of marijuana. *Id.* On December 15, 2004, he was convicted of burglary and sentenced to 1-year confinement (suspended), 18 months probation, and a $500 fine. *Id.* The marijuana possession charge was dismissed on the same day. *Id.*

7. As to the crime alleged in the indictment, the government presented significant credible evidence that Barrett played the knockout game by assaulting R.C., an African-American, with a single punch to the face on November 24, 2013 and committed the offense of willfully causing bodily injury to R.C. based on his actual or perceived race and color.

8. Barrett commented on a cell-phone video that: "The plan is to see if I were to hit a black person, would this be nationally televised?" Dkt. 22 at 12:10–14. He states in other videos on his cell phone that "African-Americans haven't fully experienced the blessing of evolution." *Id.* at 12:23–25. He also states that he had been trying to work up the courage to play the knockout game for a week and that he may have found the perfect African-American suspect. *Id.* at 13:1–9.

9. R.C. is a 79-year old African-American male. *Id.* at 13:10–15. After he was assaulted on November 24, 2013, R.C. went to Memorial Hermann Katy Hospital for treatment on November 25. *Id.* at 13:22–14:19. R.C. suffered two jaw fractures as a result of the assault and underwent surgery to

insert two metal plates on his jaw and remove three teeth from his mouth. *Id.* at 14:20–24. He was hospitalized for at least four days. *Id.* at 14:25–15:2.

10. On November 24, 2013, Barrett had been off his medication for at least three weeks. *Id.* at 45:22–25. He had also been drinking alcohol that day, namely scotch. *Id.* at 58:9–17.

### III. Conclusions of Law

#### *A. Legal Standard*

11. "When the district court . . . acts on a motion to revoke or amend a magistrate's pretrial detention order, the court acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release." *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985) (citations omitted).

12. There are two grounds for pretrial detention under the Bail Reform Act: to assure the appearance of the defendant, or to ensure the safety of the community or another person. *See* 18 U.S.C. § 3142(f). Either ground is sufficient to support pretrial detention; both are not required. *Fortna*, 769 F.2d. at 249; *United States v. Jessup*, 757 F.2d 378, 380, 388 (1st Cir. 1985), *overruled on other grounds*, *United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). If the government moves for detention in a case involving a risk to community safety, the government must demonstrate, by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); *Fortna*, 769 F.2d at 250.[3]

13. In making this determination, the court considers a number of factors specified by Congress, namely: (1) the nature and circumstances of the offense charged, including whether the offense is a

---

[3] Because the court finds by clear and convincing evidence that the record supports detention based on the risk to community safety, the court need not review Judge Stacy's alternative finding that Barrett's detention would reasonably assure his appearance at court proceedings.

crime of violence; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics, including the defendant's "character, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and [4] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4); *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992).

14. "Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990).

   **B.**   *Nature and Circumstances of the Charged Offense*

15. Barrett has been charged with one count in the pending indictment, a hate crime under 18 U.S.C. § 249(a)(1), and he faces a maximum term of imprisonment of ten years if convicted.

16. Judge Stacy correctly noted that the crime alleged is a heinous act of violence. The victim was an elderly African-American male who was beaten, knocked to the ground, and required medical attention for jaw fractures and three lost teeth. These facts, and the possible 10-year sentence if Barrett is convicted, weigh strongly in favor of pretrial detention. *United States v. Stanford*, 630 F. Supp. 2d 751, 755 (S.D. Tex. 2009); *see United States v. Almasri*, No. H-07-cr-155, 2007 WL 2964780, at *1 (S.D. Tex. Oct. 10, 2007) (finding potential ten-year sentences weighed in favor of detention).

   **C.**   *Weight of the Evidence*

17. The court next considers the weight of the evidence against Barrett as the second factor. 18 U.S.C. § 3142(g)(2); *Stanford*, 630 F. Supp. 2d at 755.

18. The evidence presented by the government at the detention hearing is significant and credible regarding Barrett's commission of a hate crime. Barrett voluntarily showed a video of R.C.'s

8

beating, which he apparently recorded that day, and there is testimony that he stated on other videos that "The plan is to see if I were to hit a black person, would this be nationally televised?" and "African-Americans haven't fully experienced the blessing of evolution." Dkt. 22 at 12:10–14, 12:23–25. This is strong evidence that Barrett willfully caused bodily injury to R.C., an African-American, because of his actual or perceived race and color, in violation of 18 U.S.C. § 249(a)(1).

19. This factor weighs heavily in favor of detention. *See Stanford*, 630 F. Supp. 2d at 756.

### D.     *Personal History & Characteristics*

20. The court next considers the defendant's history and characteristics, including the person's character, family ties, employment, past conduct, criminal and substance and abuse history, and record concerning appearances at court proceedings. 18 U.S.C. § 3142(g)(3)(A); *Rueben*, 974 F.2d at 586.

21. Barrett contends that, contrary to previous assertions, he is not a racist and works with friends and children who are minorities. Dkt. 28 at 2 ¶ 4. Barrett disputes the government's claim that he "preyed and hunted for a black person for at least a week," Dkt. 22 at 72:23–24, is substantiated in the record. Dkt. 28 at 2 ¶ 4. Lastly, Barrett contends that under certain controlled conditions, when he takes his medications for bipolar disorder and abstains from alcohol, he does not pose a risk of safety to the victim or community and would not be a flight risk. *Id.* at 2–3 ¶ 4.

22. The government responds that Barrett's prior relationships with African-Americans, however laudable, are irrelevant to his current detention. Dkt. 31 at 3. The government argues that Barrett poses a risk to the community based on his history of criminal activity (prior convictions for burglary of a vehicle and DWI), substance abuse, and mental illness. *Id.* The government contends that Barrett's medication compliance in custody demonstrates that Barrett's detention is more likely to protect public safety than if he were released, as his family has historically been unable to prevent recurrences of his disorder. *Id.*

23. The court has carefully reviewed and considered the factors relating to the defendant's personal history under 18 U.S.C. § 3142(g)(3)(A). While the court appreciates Barrett's community service and involvement in the past, Barrett has a pronounced history of alcohol and substance abuse, having attained sobriety in 2005 and relapsing in 2010. In the fall of 2013, Barrett used alcohol daily, marijuana weekly, and cocaine once.

24. The court also agrees with the government's contention that there is evidence that Barrett searched for an African-American victim for at least a week before he attacked R.C. According to Agent Tribble's testimony, Barrett states in one video on his cell phone that "he's been trying to work up the courage for the past week [to play the knockout game] . . [and] [h]e can also be heard on video stating he has found the perfect African-American suspect but then appears to change his mind." Dkt. 22 at 13:5–9. This statement and his conduct before and after the attack are evidence of Barrett's underlying biases against African-Americans in his community.

25. Thus, in light of his family's inability to assure his medication compliance in the past, Barrett's personal history weighs in favor of continued pretrial detention.

### E.   *Nature & Seriousness of the Danger*

26. The next factor the court considers is the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(4).

27. Barrett's father testified at the detention hearing that he would do everything in his power to get his son take his medication as directed. Dkt. 22 at 54:12–15. However, he also testified that at the time of the attack in late November 2013, his son had not taken lithium to treat his bipolar disorder for at least three weeks. *Id.* at 54:20–55:5. Based on Barrett's repeated failures to maintain sobriety and remain on his medication regimen, the court has no reasonable basis to believe that Barrett will remain sober and medication-compliant upon any release from custody. Further, the proposed

combination of conditions for bond do not reasonably assure the safety of the community, insomuch as the proposed psychiatric and parental treatment and oversight are commensurate with previous unsuccessful attempts to control Barrett's conduct.

28.  Based on this reality and the severity of the alleged assault against an elderly gentleman based on his race, the court finds that Barrett poses a palpable danger to R.C. and the community.  This factor weighs in favor of detention.

### IV. Conclusion

For all of the reasons discussed above, the court finds by clear and convincing evidence that there are no condition or combination of conditions for Barrett's pretrial release that will reasonably assure the safety of the victim and the community.  Accordingly, Barrett's motion to revoke Judge Stacy's order of detention (Dkt. 28) is **DENIED**.  It is further **ORDERED** that the directions regarding detention at the conclusion of Judge Stacy's order, *see* Dkt. 8 at 4, shall remain in effect.

Signed at Houston, Texas on July 22, 2014.

_____
Gray H. Miller
United States District Judge